United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 20, 2006**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

---

**No. 04-41243**

---

**PSKS, INC., doing business as Kay's Kloset ... Kay's Shoes;
TONI COCHRAN L.L.C., doing business as Toni's,**

**Plaintiffs-Appellees,**

**versus**

**LEEGIN CREATIVE LEATHER PRODUCTS, INC.,**

**Defendant-Appellant.**

---

**Appeal from the United States District Court
for the Eastern District of Texas
(2:03-CV-107-TJW)**

---

Before BARKSDALE and CLEMENT, Circuit Judges, and ENGELHARDT, District Judge[*].

PER CURIAM:[**]

Leegin Creative Leather Products, Inc., primarily challenges application of the antitrust *per se* rule to its imposing a vertical minimum price-fixing agreement on its retailer, PSKS, Inc., doing business as Kay's Kloset ... Kay's Shoes. Among other issues is the awarded damages' evidentiary basis. **AFFIRMED**.

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

In 1995, Leegin, manufacturer of Brighton women's accessories, began selling its products to PSKS, a women's clothing and accessories specialty store. PSKS invested heavily in advertising and promoting the Brighton brand; by 1999, Brighton was PSKS' best-selling and most profitable line.

In 1997, Leegin instituted the "Brighton Retail Pricing and Promotion Policy", stating it would do business only with retailers following its suggested retail prices for Brighton products. In doing so, Leegin made clear it would not do business with retailers who engaged in discounting Brighton products they intended to reorder.

Leegin subsequently introduced the "Heart Store Program", a new marketing initiative designed to provide incentives to certain Brighton retailers to promote the brand within a separate section of their stores. To become a Brighton Heart Store, retailers had to pledge to "[f]ollow the Brighton Suggested Pricing Policy at all times".

In late 2002, after learning PSKS had violated Leegin's pricing policy by placing PSKS' entire line of Brighton products on sale, Leegin suspended all shipments of Brighton products to PSKS. As a result, its sales and profits decreased substantially.

PSKS filed this action against Leegin under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1: (1) claiming it entered into illegal agreements with retailers to fix Brighton products' prices and

2

terminated PSKS as a result of those agreements; and (2) seeking future-lost-profits damages. (Co-plaintiff Toni Cochran, L.L.C.'s claims were dismissed at the close of plaintiffs' evidence. Cochran did not appeal.)

The jury found: Leegin and its retailers agreed to fix the retail prices of Brighton products; this caused PSKS to suffer antitrust injury; and PSKS was entitled to damages of $1.2 million. Pursuant to 15 U.S.C. § 15(a), the district court trebled the damages and awarded attorney's fees. Post-judgment, Leegin renewed its motion for judgment as a matter of law and moved for a new trial. The motions were denied.

## II.

Leegin does *not* challenge the jury's finding it entered into price-fixing agreements. Instead, it challenges, *inter alia*, the application of the *per se* rule and the damages' evidentiary basis.

## A.

Leegin claims the rule of reason should apply to PSKS' antitrust claims. This issue of law is reviewed *de novo*. ***Craftsmen Limousine, Inc. v. Ford Motor Co.***, 363 F.3d 761, 772 (8th Cir. 2004) ("[A]lthough a court's determination that the *per se* rule applies might involve many fact questions, the selection of a mode [of analysis] is entirely a question of law.") (alteration in original; internal citation and quotation marks omitted). Each of the following three challenges fails.

3

1.

Leegin asserts: although the Supreme Court first applied the *per se* rule to vertical price fixing in ***Dr. Miles Medical Co. v. John D. Park & Sons Co.***, 220 U.S. 373 (1911), it has not applied the rule consistently. The cases cited by Leegin in which the Court applied the rule of reason, however, did *not* involve a vertical minimum price-fixing agreement. *See* ***State Oil Co. v. Khan***, 522 U.S. 3 (1997) (considering the validity of the *per se* rule against a vertical *maximum* price-fixing agreement); ***Bus. Elecs. Corp. v. Sharp Elecs. Corp.***, 485 U.S. 717 (1988) (applying the rule of reason to a vertical agreement that had the purpose and effect of increasing retail prices, but *without specifying the price to be charged*); ***Cont'l T. V., Inc. v. GTE Sylvania, Inc.***, 433 U.S. 36 (1977) (rejecting the *per se* rule for a vertical *non-price* restriction).

Because the Court has consistently applied the *per se* rule to such agreements, we remain bound by its holding in ***Dr. Miles Medical Co.*** *See also* ***Simpson v. Union Oil Co. of Cal.***, 377 U.S. 13, 17 (1964) ("[A] supplier may not use coercion on its retail outlets to achieve resale price maintenance".); ***United States v. Parke, Davis & Co.***, 362 U.S. 29, 44 (1960) ("When the manufacturer's actions ... go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means

4

which effect adherence to his resale prices, ... he has put together a combination in violation of the Sherman Act."). In *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 769 (1984) (Brennan, J., concurring), Justice Brennan commented on the Court's continued application of the *per se* rule, consistent with congressional intent, to distributor-termination cases in which there is a concerted action to set prices:

> As the Court notes, the Solicitor General has filed a brief ... urging us to overrule the Court's decision in *Dr. Miles Medical Co.* .... That decision has stood for 73 years, and Congress has certainly been aware of its existence throughout that time. Yet Congress has never enacted legislation to overrule the interpretation of the Sherman Act adopted in that case. Under these circumstances, I see no reason for us to depart from our longstanding interpretation of the Act.

2.

In the alternative, Leegin claims: its pricing policy did *not* result in competitive harm; therefore, it qualifies for an exception to the *per se* rule. Leegin asserts both the Supreme Court and this court have recognized exceptions to the rule's application in appropriate cases, citing *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979); *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir. Unit A July 1981); and *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980).

5

As before, none of these cases involved vertical minimum price fixing. Furthermore, each was decided *before* the Court reaffirmed the *per se* rule's application to vertical minimum price-fixing agreements in **Sharp Electronics Corp.**, **Spray-Rite Service Corp.**, and **Khan**, as discussed *supra*.

3.

Leegin challenges the exclusion of its economic expert, who opined: (1) economic conditions did *not* dictate the *per se* rule's application; and (2) Leegin's pricing practices were pro-competitive, justifying the rule of reason's application. We review for abuse of discretion. **Watkins v. Telsmith, Inc.**, 121 F.3d 984, 988 (5th Cir. 1997) ("District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous.") (internal citations and quotation marks omitted).

With the *per se* rule, expert testimony regarding economic conditions and the pricing policy's pro-competitive effects is *not* relevant. **Viazis v. Am. Ass'n of Orthodontists**, 314 F.3d 758, 765 (5th Cir. 2002) ("If application of the *per se* rule is appropriate, competitive harm is presumed, and further analysis is unnecessary."), *cert. denied*, 538 U.S. 1033 (2003); *see also* **N. Pac. Ry. Co. v. United States**, 356 U.S. 1, 5 (1958) ("[The] principle of *per se* unreasonableness ... avoids the necessity for

6

an incredibly complicated and prolonged economic investigation into the entire history of the industry involved ... in an effort to determine ... whether a particular restraint has been unreasonable".)

B.

Leegin claims PSKS did *not* prove antitrust injury, maintaining it is required under both the *per se* rule and the rule of reason. ***Atl. Richfield Co. v. USA Petroleum Co.***, 495 U.S. 328, 341-42 (1990). Because antitrust injury *vel non* is a component of standing, we review *de novo*. ***DeLong Equip. Co. v. Wash. Mills Electro Minerals Corp.***, 990 F.2d 1186, 1194 (11th Cir.), *cert. denied*, 510 U.S. 1012 (1993); *see also* ***Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.***, 123 F.3d 301, 305 (5th Cir. 1997) ("Antitrust injury must be established for the plaintiff to have standing under section 1 ... of the Sherman Act.").

1.

Antitrust "injury ... [is what] the antitrust laws were intended to prevent and ... flows from that which makes defendants' acts unlawful". ***Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.***, 429 U.S. 477, 489 (1977). "It ensures that the harm claimed ... corresponds to the rationale for finding a violation of the antitrust laws in the first place." ***Atl. Richfield Co.***, 495 U.S. at 342.

7

In *Doctor's Hospital of Jefferson, Inc.*, 123 F.3d at 305, our court explained: "[A]ntitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition". Thus, antitrust injury is distinct from injury to competition, "the latter of which is often a component of substantive liability". *Id.*

PSKS suffered antitrust injury. Its refusal to follow Leegin's pricing policy resulted in inability to obtain its best-selling and most profitable product line. *See Pace Elecs., Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 124 (3d Cir. 2000) ("[A] dealer terminated for its refusal to abide by a vertical minimum price fixing agreement suffers antitrust injury and may recover losses flowing from that termination".).

2.

In the alternative, Leegin claims the district court erred by failing to instruct the jury on the definition of antitrust injury. Because such injury is a component of standing for the court's determination, this claim necessarily fails. *See Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1182 (5th Cir. 1988) ("Antitrust injury is a component of the standing inquiry, not a separate qualification.").

C.

8

The jury awarded approximately 70 percent of the requested damages: $1.2, of the requested $1.7, million. Leegin contests the damages' evidentiary basis. The jury's award of antitrust damages is reviewed under a relaxed standard. *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 303 (5th Cir. 2003) ("[T]he nature of an antitrust claim means that some plaintiffs can only hypothesize about what the state of their affairs would have been absent the wrong ... and we have, therefore, declined to hold antitrust plaintiffs to the same burden of proof of damages as demanded of plaintiffs in other civil cases".) (internal citations and quotation marks omitted); *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1067 (5th Cir. 1985) ("Once a plaintiff has proved by a preponderance of the evidence the fact of injury, a jury may use its discretion in determining the exact amount of damages resulting from the antitrust violation."), *cert. denied*, 474 U.S. 1102 (1986); *Malcom v. Marathon Oil Co.*, 642 F.2d 845, 864 (5th Cir. Unit B Apr.) ("The relaxation of standards of proof are *particularly appropriate* in cases where the finder of fact *must estimate lost future profits*.") (emphasis added), *cert. denied*, 454 U.S. 1125 (1981).

In calculating damages, PSKS' expert averaged the gross profits PSKS earned from selling Brighton products in 2000 ($289,516), 2001 ($201,591), and 2002 ($141,458), concluding it would lose an estimated $210,855 in gross profits each year. (The

9

decline in gross profits during 2001 and 2002 was attributed to: the 11 September 2001 terrorist attacks; and problems obtaining Brighton products in 2002.) That amount was multiplied by ten, the number of years PSKS' co-owner estimated it would take PSKS to recover from the termination of Brighton shipments, particularly because of the line's uniqueness. As discussed *infra*, PSKS offered evidence that net profits were the same as gross profits; the total was discounted to present value. Leegin did *not* offer an alternative method for calculating damages. *See* **Greene v. Gen. Foods Corp.**, 517 F.2d 635, 665 (5th Cir. 1975) (noting defendant's failure "to demonstrate any better method of lost future profits that could have been applied to the available data"), *cert. denied*, 424 U.S. 942 (1976).

Obviously, it is impossible to prove PSKS' exact profits had Leegin not terminated its Brighton shipments. Instead, PSKS presented expert testimony, which "provide[d] a 'just and reasonable estimate of the damage based on relevant data'". **Bell Atl. Corp.**, 339 F.3d at 303 (quoting **Bigelow v. RKO Radio Pictures, Inc.**, 327 U.S. 251, 264 (1946)). Accordingly, pursuant to our relaxed standard of review, each of the following four challenges fails.

1.

Leegin challenges the ten-year future-damages period. The expert relied on the above-referenced testimony that: it took PSKS ten years to find Brighton; the business grew very fast once that line was incorporated; and ten years was the absolute minimum it would take PSKS to recover from the line's termination. This testimony by PSKS' co-owner was based on his 17-years experience building a profitable business.

The damages period is an issue for the jury. *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 47 (5th Cir.) ("The duration of the period during which plaintiff might be expected to profit will vary from case to case; it is susceptible of no precise formulation, and must be left to the processes of the jury informed by the presentation of conflicting evidence."), *cert. denied*, 409 U.S. 1077 (1972).

2.

Leegin claims insufficient evidence for the lost net-profits calculation. In this regard, PSKS utilizes a point-of-sale system to track the direct costs and selling price of its inventory, allowing it to access information by an individual product or product line. PSKS' co-owner used this system to determine Brighton's contribution to PSKS' net profits during the three years prior to the termination, basing his projections on the average net profits during those three years. In doing so, he did *not* project any sales growth, despite testimony that the retail stores to which Leegin sold in 2003 experienced a 16-percent increase in revenues.

11

Also, he did *not* consider profits from cross sales to customers who came to the store to purchase Brighton goods. Further, he testified gross and net profits were the same in this instance, because PSKS did not save costs as a result of its loss of the Brighton line.

Our court has approved future-profits estimates based on averages of past history. *See* **Malcom**, 642 F.2d at 859-60. As noted, although PSKS' average profits from Brighton declined during the three years considered, this decline was attributed to the events of 11 September 2001 and PSKS' difficulty in obtaining Brighton products in 2002.

3.

Leegin maintains the damages model failed to account for mitigation of damages. It asserts PSKS profitably sold substitute products shortly after it lost the Brighton line. Leegin's representative, however, testified that, as early as 1998, she saw lines of handbags, shoes, and belts that competed with Brighton products.

The mere presence of competing products does *not* show they were substitutes for the Brighton line, or that their sale mitigated PSKS' loss. Its continued business of selling women's clothing and accessories, some of which are similar to the Brighton line, does not negate the lost profits incurred from its inability to sell Brighton products. *See* **Bhan v. NME Hosps., Inc.**, 669 F.

12

Supp. 998, 1014 (E.D. Cal. 1987) (recognizing that providing an antitrust violator with immunity simply because the victim mitigated damages would contravene the goal of limiting anticompetitive conduct), *aff'd*, 929 F.2d 1404 (9th Cir.), *cert. denied*, 502 U.S. 994 (1991).

### 4.

Finally, Leegin claims the damages model impermissibly utilized a risk-free discount rate for the present-value award. "[T]he selection of a discount factor is a question of fact to be determined by the trier of fact". ***Bridas S.A.P.I.C. v. Gov't of Turkmenistan***, 345 F.3d 347, 364 (5th Cir. 2003) (internal citations and quotation marks omitted), *cert. denied*, 541 U.S. 937 (2004).

The jury was properly instructed to award only the present value of future damages. It heard testimony, including on cross-examination, regarding the rate utilized.

### III.

For the foregoing reasons, the judgment is **AFFIRMED**; attorney's fees and expenses incurred for this appeal are **AWARDED** PSKS, pursuant to 15 U.S.C. § 15(a). This case is **REMANDED** to determine that amount.

*AFFIRMED; ATTORNEY'S FEES and EXPENSES*

*AWARDED FOR APPEAL; REMANDED*